ALEXANDER H. VANCE, APPELLANT, v. THE BURLINGTON & MISSOURI RIVER RAILROAD COMPANY IN NEBRASKA, APPELLEE.

1. Railroad Land Grant: WHEN IT BECAME EFFECTIVE AGAINST ADVERSE CLAIMANTS. The grant of lands to the Burtington & Missouri River Railroad Company was of a present interest, and effective against adverse claimants, as to all of the odd numbered sections not excepted in the grant; on each side, and within twenty miles of the line of the road, immediately upon and from its definite location upon the ground, which was done June 15th, 1865. As to such lands no specific selection by numbers was necessary to the perfection of the company's. right.

2. Occupying Claimant Law. When the occupying claimant: is a vendee of the land under a contract, providing for a forfeiture of all his improvements in case of non-performance on his. part, he is not, in case of eviction at the suit of the vendor, entitled to the benefits of the act for the relief of occupying claimants.

APPEAL from the district court of Seward county. The facts are as follows: On the 6th day of October, A. D. 1865, Samuel G. Bingamon made a homestead entry, under the United States homestead law of 1862, upon the north half of the southeast quarter, and the south half of the northeast quarter of section 19, town 9, range 4 east in Seward county of this state. This entry was. cancelled April 28th, 1871, for abandonment, Bingamon

having voluntarily relinquished it December 16th, 1870. On the 15th day of May, A. D. 1871, Alexander H. Vance made a homestead entry upon the same tract of land, and continued to reside thereon and made improvements. This entry was cancelled by the commissioner of the general land office May 13th, 1873, because of conflict with the grant of lands to the Burlington & Missouri River Railroad Company by act of congress, 1862 and 1864. The location of the road was made June 15th, 1865, and the odd numbered sections along the line were withdrawn from market on account of the grant, February 3rd, 1866. The road was duly constructed, and on the 28th of June, A. D. 1875, the company received a patent for lands from the United States government, including the above described tract. After the cancellation of his entry, and on the 2d of October, A. D. 1873, Vance entered into the contract of purchase with the company, which is referred to in the opinion. On the 11th of February, 1878, the commissioner of the general land office reversed the decision of May 18th, 1873, cancelling Vance's homestead entry, and he having duly made final proof, etc., received a patent for said tract of land, dated April 9th, 1879. This action was commenced October 9th, 1879, the plaintiff Vance praying for a decree declaring the patent to the railroad company to be null and void, etc., and that the title to said land was in the plaintiff, etc., and for other and further relief, etc. On a trial before POST, J., the court found in favor of the defendants, declaring the patent to Vance to be null and void, and adjudging the same to be in the defendant, etc., and that said defendant recover possession, etc. Vance appeals.

*McKillip & Page,* for appellant.

1. Title of defendant did not attach as against Bingamon's entry. *Newell v. Sanger,* 2 Otto, 761. *U. S. v. B.*

& M. R. R., 8 Otto, 339.   St. Joe & Denver R. R. v. Baldwin, 7 Neb., 252.   Patent was issued to plaintiff by virtue of act of congress, 19 U. S. Stat. at large, 35. The act is retrospective.   Sedgwick on Statutes, 620. Ritchfield v. Johnson, 4 Dillon, 754.*  When an act of present grant does not locate the lands granted, whatever act under the grant does locate them by identifying the particular sections of land granted, from the time of *that* act the grant attaches and relates back to the date of passage of the granting law, as against the government; but as against intervening purchasers, or settlers under the homestead or pre-emption acts, the grant attaches or takes effect only from the time of the act done, which locates and identifies the particular sections or tracts granted.   M. K. & T. R. R. v. K. P., 7 Otto, 496.   Ryan v. R. R. Co., 9 Otto, 387.

2.  Plaintiff is entitled to benefits of occupying claimant law.   Harrison v. Castern, 11 Ohio St., 347.   Shaler v. Magin, 2 Ohio, 236.   Longworth v. Wolfington, 6 Ohio, 10.   Davis v. Powell, 13 Ohio, 321.   Litchfield v. Johnson, 4 Dillon (C. C.), 557.   Chinn v. Darnett, 4 McLean, 440. Kram v. Mears, 12 Kas., 335,  Iowa Railroad Co. v. Adkins, 38 Iowa, 351.   .

T. M. Marquett and J. W. Deweese, for defendant, cited Railroad Company v. Smith, 9 Wall, 99.   Knevals v. Hyde, 1 McCrary, 402.  A. T. & S. F. R. R. v. Rockwood, 25 Kan., 292.   U. S. v. B. & M. R. R., 8 Otto, 334.   On applicability of act of congress, 19 U. S. Statutes at large, 35, cited Dash v. VanKleeck, 7 Johns., 503.   Lytle v. Arkansas, 9 How., 333.  Yosemite Valley Case 15 Wall., 77.   Vol. 4, Cong. Rec., 1st sess. 44th congress, 605—607.

LAKE, CH. J.

Whenever the question of right to land under the act of congress, through which the defendant company here

claims title, or others of similar import, has been consid-
ered by the supreme court of the United States, the hold-
ing in effect has been that the grant is of a present
interest, and effective as against all adverse claimants
immediately upon and from a precise designation there-
of, which designation is accomplished either by a definite
location of the line of the road upon the ground, or
through a specific selection by numbers.   And further,
that where latteral limits are given within which the
grant is to operate, as in that made to the Union Paci-
fic Railroad Company, and in most of the others giving
like aid, no specific selection by numbers is requisite, the
definite location of the track being sufficient.  *R. R. Co.
v. Fremont County*, 9 Wall, 89.  *Mis., Kan. & Texas Rail-
way Co. v. Kansas & Pacific Railway Co*, 7 Otto, 498.
*United States v. B. & M. R. R. Co.*, 8 Id., 334.    *Ryan v.
R. R. Co.*, 9 Id., 382.

The reason for the rule that no specific designation by
numbers is necessary, and that the mere location of the
line of the road upon the ground will suffice in those
cases where definite latteral bounds are set to the grant
evidently is that, inasmuch as all of the lands, or rather
all of the odd numbered sections within the designated
limits, even if none have been previously disposed of,
are required to satisfy the donation, there is no want of
certainty as to what the grant was intended to cover.
It would be difficult indeed, if not impossible, to devise a
more certain and unmistakable designation of lands
than one which, in general terms, mentions all of the
odd numbered sections on both sides and within a spec-
ified distance from the center line of a road.

As construed in the case of the *United States v. B. &
M. R. R. Co., supra,* the grant in question is without de-
finite latteral limits.   No particular selection of the land
in controversy by numbers was made by the company,
at least not until it was entered as a homestead by the

plaintiff in May, 1871. The location of the company's road was definitely fixed on the 15th day of June, 1865. Therefore, conformably with the decisions made in the cases cited above, if the grant of the ten alternate sections per mile had been in terms limited to the distance of twenty miles on each side of the track—the land in controversy being within that distance—no doubt whatever could be entertained that the right of the company definitely attached to it immediately upon such location, thus antedating the plaintiff's claim by nearly six years,

The case of the *United States v. B. & M. R. R., Co.*, *supra*, concerned the title of lands selected by this defendant to supply a deficiency claimed to exist in the lands described in the grant, within twenty miles of the road, in consequence of sales made by the government prior to its definite location. As to these deficiency lands, it is doubtless true that no right attached in favor of the company until definite selections by numbers were made, there being no other available means of designating them, or knowing that they were claimed under the grant. But, as to any of the lands lying within twenty miles of the center line of the road, no such necessity existed. By the terms of the grant, "every alternate section of public land (excepting mineral lands as provided in this act,) designated by odd numbers, to the amount of ten alternate sections per mile, on each side of the road, and the line thereof," etc., is given.

By this language it must have been intended, if not actually to restrict the grant within the distance of twenty contiguous sections, or miles, on each side of the line of the road, at least that the lands be taken as near that line as possible. It certainly could not have been the intention of congress that available lands within the distance of twenty miles might be refused, and their place filled by selections from the body of public lands beyond

19

that distance. If this be so, then, as all of the lands within the distance of twenty sections, at least, were required to make up the quantity to which the company was entitled, does it not follow that, to this extent, the designation was just as certain upon the location of the road as it would have been by an express limitation, in the most positive terms, to that distance? It seems to us that it was. Therefore, as to all of the odd numbered sections within twenty miles of the line of the road, we see no reason for a rule different from that which governs in those cases where express latteral limits are given. There is equal certainty, and the principles involved seem to be the same in both cases.

For these reasons we conclude that the defendant's title through its patent from the United States is good; and, having its inception, by relation, on the 15th day of June, 1865, when the line of the road was definitely fixed, it necessarily follows that the patent issued to the plaintiff, in virtue of his settlement in May, 1871, is void, and confers no right whatever to the land. The previous settlement made by Samuel G. Bingamon in October, 1865, under the homestead law, has no bearing whatever on the case. This settlement also was subsequent to the time when the defendant's right attached, and did not affect it.

One other question remains to be considered. It is whether the plaintiff is entitled to the benefit of the "act for the relief of occupying claimants." Comp. Stat., Chap. 63.

It appears that on the 2nd day of October, 1873, after a decision adversely to him by the land department, the plaintiff applied for and took a contract in writing from the defendant for the sale to him of the land in controversy, on a 10 years credit, and paid one years interest on the agreed consideration in advance. This and the interest for the two succeeding years, in all the sum of $259.45, was all

that he paid on the contract; as to all other payments and requirements therein provided for he refused further performance. The particular terms of this contract, save the conditions of forfeiture, are not essential to the present inquiry and need not be mentioned.

The conditions of forfeiture were, in substance, that if Vance failed to make the agreed payments, or any of them, punctually, or to pay the taxes assessed against the land as they became due, or, in fact, to perform any of the other agreements and stipulations by him to be performed, then the contract, to the extent that it bound the company, was to become "null and void," and all rights and interests thereby created in favor of Vance were to "utterly cease and determine, and the right of possession, and all equitable and legal interests in the premises," should revert to the company, "without any declaration of forfeiture or act of re-entry, or any other act of the " company " to be performed;" and without any right " of reclamation or compensation for moneys paid, or services performed, as absolutely, fully and perfectly as if this contract had never been made. And said party of the first part," the company, " shall have the right, immediately upon the failure of the party of the second part," Vance, " to comply with the stipulations of this contract, to enter upon the land aforesaid, and take immediate possession thereof, together with the improvements and appurtenances thereto belonging," And Vance further agreed that thereupon he would " surrender unto the said party of the first part the said land and appurtenances," and that no court should relieve him from the effects of " a failure to comply strictly with this contract." In short, the contract is one wherein the rights of the respective parties are set out with great particularity, and the privilege of the company to declare a forfeiture against the grantee for the non-performance of

certain conditions, is as clearly expressed as is possible.
There is no pretense that the contract is at all affected
by either fraud or mistake in the making of it, and the
only ground upon which the appellant seeks to break the
full force of its provisions is that, as he alleges in his
petition, there was an accompanying oral agreement,
made by the company to the effect that, "said written
contract should not estop, prevent, or interfere with
plaintiff," (Vance,) "to further prosecute his claim to
said land under his said homestead entry thereof, but
that said plaintiff should be free to prosecute the same as
fully in all respects as though said written contract to
purchase said land had not been made by said plaintiff;"
and that if Vance finally succeeded in obtaining a rever-
sal of the decision against him, "either by the commis-
sioner or in the courts, the said defendant agreed to re-
pay to plaintiff all moneys, with interest from the time
of payment, then or thereafter paid by him on said con-
tract," * * * and "that said written contract should, on
obtaining such reversal of the land commissioner's de-
cision, be no longer in force, but should then be deemed
rescinded and void."

In the answer of the defendant all of these allegations,
respecting this oral agreement, are denied, and the judg-
ment of the district court is that it was not made. And
the finding upon this point is clearly supported by the
evidence, as we think.

To support his averments respecting such agreement,
Vance himself testified in substance that at the time of
his purchase of the land he "went into the railroad land
office, and Mr. McFarland," who acted for the company
as its agent, "was alone; it was about dinner time. I
acknowledged frankly to McFarland that I was beat on
the appeal by the secretary of the interior's decision, but
I told him at the time that I had full faith in the gov-
ernment, that the decision would be reversed, and asked

him providing I paid him money in order to secure the land, whether in case of a reversal of this decision I could recover the money I paid them; he told me most certainly I could, the company was honorable, and they would refund the money in case I procured a reversal of the decision.   On the strength of that I purchased the land."

Vance further testified that:   "When I received notice of my re-instatement, I called on McFarland and refreshed his memory in regard to the promise made to me; he told me this:   'You entered into the contract and I will refund you your principal.'   I objected to that, and told him there was interest coming to me.   I thought there was interest coming to me on this money lying in their office.   We split on that.   He told me, 'Any time you fetch in your contract and surrender it I will refund you your principal.'   At the time the contract was made that was the understanding.   I was to surrender the contract in case of reversal, that was my understanding."

Opposed to this there is the testimony of McFarland, who says:   "Mr. Vance's recollection of that conversation and my own are different.   Mr. Vance came as he states, and said his homestead entry had been finally cancelled, as I already knew.   He was anxious to secure the land in some way, and we were quite willing he should have the first opportunity to buy it.   We agreed upon the price, on ten years credit, nine dollars per acre, and he paid one payment of interest.   He asked me the question, as I now remember, in case we failed to secure the title—in case the company failed to secure title to the land—would we refund the money he was then paying.   I told him it certainly would.   That is the substance of the conversation, as I now remember it.   I don't think there was any talk at all about prosecuting his claim any further before the department.   He may have had such an intention, but I don't think he mentioned it there."

And in answer to the question "whether there was any promise made to refund to him in case he got a patent to the land," this witness further testified: "No sir, there was not. I told him if we failed to give title, couldn't give title to him, we would refund the money, and save any controversy on that point."

And on his cross examination in answer to the question, "did you ever offer to pay this money back to Mr. Vance?" he said, "No sir, never did, except in one respect. Mr. Vance came into our office at one time, I don't remember what date it was, it was when he had got title to his land, and he asked his money back. I told him he was not entitled to any money under the arrangement made with me. I did not look at his account. I presumed he had paid some of the principal on the contract. I said to him if he did not want to carry out the contract, if he wanted to stand on his homestead entry, to bring in his contract and we would pay him back any principal he had paid. He brought the contract in at a subsequent date; at that time I looked up his account and found he had paid no principal at all, and I refused to pay him any principal." * * * "I told him if he thought his title better than ours to bring in his contract, and we would pay him back any principal he had paid."

From the foregoing, which is the substance of all the evidence there is on the subject, it must be apparent that the allegations of the petition as to the oral agreement are not proved. And, as before stated, so the trial court found; the finding being expressed in these words: "And the court do further find, in response to plaintiff's request, that, as matter of fact, at the time of the making of the land contract between the defendant company and the plaintiff, it was agreed by the said company, by J. D. McFarland, its duly constituted agent, that in case the said company failed to perfect its title to the said land, the said company would claim no right under said con-

tract against the said plaintiff, and that said agreement was a verbal one, and was not included in the written contract of purchase. And the court do further find that said defendant company did not fail to perfect its title to said land, but on the contrary has fully perfected the same." And the consideration of the court consequently was that, as to Vance, the written contract, with all of its provisions respecting the payment of the purchase money, taxes, etc., and as to forfeitures for non-payment at the option of the company, remained in full force. Such being the adjudged relation of Vance to the railroad company respecting this land, is he in an attitude which entitles him, upon eviction for forfeiture, to relief as an occupying claimant?

The cases in which such relief may be afforded are all mentioned in the first section of the act, and are as follows : *First.* "When any occupying claimant, being in quiet possession of any lands, or tenements, for which such person can show a plain and connected title, in law or equity, derived from the records of some public office;" *Second.* "Or being in quiet possession of, and holding the same by deed, devise, descent, contract, bond or agreement, from and under any person claiming title as aforesaid derived from the records of some public office, or by deed duly authenticated and recorded;" *Third.* "Or by being in quiet possession of, and holding the same under sale on execution against any person claiming title as aforesaid, derived from the records of some public office, or by deed duly authenticated and recorded;" *Fourth.* "Or being in possession of, and holding any land under any sale for taxes authorized by the laws of this state, or the laws of the territory of Nebraska;" *Fifth.* "Or any person in quiet possession of any land, claiming title thereto, and holding the same in good faith under a deed of sale made by executors, administrators, or guardians, or by any other person or persons, in pursuance of any

order of court, or decree in chancery, where lands are, or
have been directed to be sold, and the purchaser or
purchasers thereof have obtained the title thereto, and
possession of the same, without any fraud or collusion on
his, her, or their part." Any person falling within the
description of either one of these five classes, the law de-
clares, "shall not be evicted, or turned out of possession
by any person, or persons, who shall set up and prove an
adverse and better title to said lands, until said occupy-
ing claimant, his, her, or their heirs, shall be fully paid
the value of all lasting and valuable improvements made
on such land by the occupying claimant," etc. [Comp.
Stat., Chap. 63.]

Now is it not obvious that the plaintiff, according to the
evidence and finding of the district court, belongs to nei-
ther of these classes? Having deliberately, and without
fraudulent inducement, or mistake of facts, entered into
this contract with the railroad company, the actual owner
of the legal title, for the purchase of the land, is he in a
situation to say, that the title is "adverse" to him? Is
he not effectually estopped from so claiming? By the
plain letter of the statute it is only when the occupying
claimant's possession is overthrown "by an adverse and
better title" than his own, that it affords him any relief.
Surely, a title which he has so far recognized as to
purchase for his own protection, and under which he
holds possession of the land, can in no sense be properly
said to be adverse to him. To hold it to be so would, as
we think, be equivalent to saying, that provisions for for-
feiture for non-payment, etc., in contracts for the sale of
land, although made with all fairness, and in the utmost
good faith, shall be enforced only at the option of the
purchaser. That so startling an effect was ever intended
for this law by its framers we cannot believe.

It is true that in its provisions it is eminently humane
and should be liberally construed. It should be admin-

istered in the same spirit that prompted the legislature to its enactment. But, notwithstanding all this, the courts have no right to extend its operation to cases not falling fairly within its terms. The intention of the law-makers evidently was that in the specified cases, it might be resorted to as a shield against the enforcement of strictly legal, but in one sense inequitable demands, based upon adverse and superior titles, but never as a weapon of offense, by one party to a contract, to strike down and destroy rights of the other, which, for a sufficient consideration, he had solemnly undertaken to respect.

Such being our views upon this branch of the case, we must hold that, sustaining the relation of vendee to the defendant, the plaintiff is not entitled to relief as an occupying claimant, and the judgment of the district court must be affirmed.

JUDGMENT AFFIRMED.

MAXWELL, J., dissenting.

There is but little dispute as to the facts in this case, and the principal questions involved are purely questions of law. The supreme court of the United States seems to have given a construction to the act granting lands to the defendant as to the time when it had so far complied with the act of Congress as to withdraw the lands in dispute from private entry, homestead and preemption. And as that court is the final arbiter in construing a statute of the United States, we must accept its decision thereon as final. It would seem, however, to be nothing but justice, to grant settlers taking homesteads on such lands before they are withdrawn from market, a right to enter the same, and either compensate the company in money, or allow it to select other lands in lieu of those thus taken. There is gross injustice in the government inviting settlers to enter these lands at the several land offices, and to receive the money of such settlers for the costs of sur-

veying and land office fees, when in fact the government
will not protect them in their purchases.    And the wrong
does not stop there.    A party who is permitted to enter
such lands as a homestead, or preemption, makes his
home on the land thus entered, breaks up and opens a
farm and makes other valuable improvements thereon,
only to find after years of self-denial and toil, that the
land was not subject to entry, and that he is not the
owner, while in the mean time all the available public
land within reach has been entered.    All these wrongs
could be prevented, if the government in a case like that
under consideration, would promptly withdraw its lands
from market, or protect those settling thereon prior to
their withdrawal.    It is no answer to say that the law
was notice to every one  of the nature of the grant, and
that the purchaser took a preemption or homestead
on the odd-numbered sections of such lands at his peril,
because until the location of the line, all of these lands
were subject to homestead and preemption, and the grant
did not attach to any particular tract.    And certainly a
party who was permitted to enter lands as a homestead,
within the limits of the grant, might reasonably be sup-
posed to have entered the same in good faith, and to be
entitled to compensation for his improvements in case of
eviction.

Occupying claimants, who have made valuable and
lasting improvements on real estate, and have there-
after been evicted therefrom, have been allowed to recover
for their improvements in Ohio ever since the case of
*Lessee of Shaler v. Magin,* 2 Ohio, 236, where an entry had
been made on the lands in dispute prior to 1818, under
which the defendant took possession and made the im-
provements in question.    In October, 1818, after the im-
provements had been made, the entry was withdrawn,
and about the same time another entry was made on the
land by one Ellis, under whom the defendant claimed.

It was held, that as the claimant had an equitable title of record, he was entitled to pay for his improvements made before his title commenced.   The question was again before that court in the case of *Longworth v. Worthington*, 6 Id., 9, where it was held, that a purchaser of real estate at administrators' sale, if evicted by the heirs, was entitled to the benefit of the occupying claimant law.   In the case of *The Lessee of Davis v. Powell*, 13 Ohio, 308, it was held, that a defendant holding possession of premises under claim of title, will be allowed under the occupying claimant law, as well for improvements made by him before his title commenced, as for those made afterwards. The court say:   (page 320,)   "The equity of the statute embraces all improvements made in the honest belief of ownership, if, at the time of the rendition of judgment, the occupant is in possession under such title as brings him within the meaning of the statute.   If such a state of facts exist, as to call the statute into action, it never stops until it has worked out complete equity and justice, and embraced the entire improvements beneficial to the successful claimant, and honestly made.   Any other construction would permit an honest purchaser of land, buying from one, without color of title, who sells from mistaken belief of ownership, to be swept out of the hard toil of years, expended in improvements made for the provision of his family or the repose of age.   The statute is to be so construed, whenever a case comes within its letter, that the person receiving the benefits and advantages of improvements, shall make compensation.   It rests on the broadest equity, and in the language of the court in *Longworth v. Worthington*, 6 Ohio, 10, may justly claim a liberal construction."

In *Harrison v. Castner*, 11 Ohio State, 339, the doctrine of the cases above cited was approved.

In the case of *Doe, ex dem., C. Chim, v. Darrell*, 4 McLean, 440, the defendants patent for lands in the

Virginia military district, was dated April 14, 1806, his entry was made November 16th, 1798, and the survey was executed April 2nd, 1799. The lessor of the plaintiff claimed under a patent dated January 30th, 1827, the entry being made in July, 1819, and the survey in 1821. It was held that the defendant was entitled to compensation for his improvements.

In *Litchfield v. Johnson*, 4 Dillon, 551, it was held, that settlers on what were known as the Des Moines river lands in Iowa, were entitled to the benefits given by the statute, when they had made valuable improvements on lands, of which they were afterwards adjudged not to be the rightful owners.

In the case of *Stebbins v. Guthrie*, 4 Kas., 354, the supreme court of Kansas approved of the decisions above cited from Ohio. The question was again before the supreme court of Kansas in the case of *Krause v. Means*, 12 Kas., 335, and it was held that one who is in quiet possession of land, and holding the same by bond from, and under any person claiming title by deed, duly authenticated and recorded, is entitled to the benefits of the occupying claimant law.

In *Lemart v. Barnes*, 18 Id., 9, the land in controversy was originally a part of the Osage Indian reserve, but afterwards, under the provisions of article 14, of the Osage Indian treaty of September 29th, 1855, was alloted to a certain half-breed Osage Indian. In August, 1867, the occupying claimant obtained his title to said land from the half-breed Indian and paid him therefor $350.00. The occupying claimant then took possession of said land and remained in possession until evicted. In February, 1872, the successful party procured his title to the land in dispute from the half-breed Indian. It was held that the claimant was entitled to compensation for his improvements. Other cases could be cited, sustaining the proposition that an

occupying claimant is entitled to full compensation for his improvements. The rule rests upon the plainest principles of justice. If A. has made valuable and lasting improvements upon lands that are afterwards adjudged to be the lands of B., is it not just that B. should pay for such improvements?

The improvements upon such lands not unfrequently are of greater value than the land itself, and have absorbed in their construction the accumulations of many years of toil, and self-denial. Even where the occupying claimant is fully compensated for his improvements—and he should be fully compensated in all cases—he, in many, if not most cases, will sustain heavy loss. In the case at bar two patents were issued by the United States, one to the plaintiff and one to the defendant. This is a contest between these patents. They cannot both be valid. In order to determine the validity of either, we must recur to the date of filing the plat locating the line of road of the defendant, which being prior in point of time to the homestead entry, and there being no proof that land in lieu of that occupied by the plaintiff has been entered by the defendant, the right to the land must be held to be in the defendant. But the plaintiff evidently made his improvements on the land in good faith. These improvements materially enhance the value of the land, and justice requires that the plaintiff should be paid for this enhanced value. This law should be given no narrow, technical construction, but should be administered in the broad principles of justice, in which it had its origin. The contract from the defendant to the plaintiff does not seem to enter into this question. The plaintiff claims nothing under it. It was taken after the improvements, or a considerable portion of them, were made, and whether the plaintiff notified Mr. McFarland that he intended to continue his contest or not, is not material in the case. The plaintiff's right,

to compensation is denied upon the ground that he is the vendee of the defendant, and therefore is estopped by his contract. If this is true, does the fact that he received the contract prevent his ignoring it, and claiming under a superior title, namely, a patent from the United States? The patent is not void upon its face, and if void at all, is so because the rights of the defendant attached to the land before that of the plaintiff. The plaintiff settled upon this land as a homestead, made the necessary improvements to comply with the law, has occupied the premises for a much longer period than five years, and entered the same as a homestead, and has thereby exhausted his right of homestead under the laws of the United States. A homestead entry certainly comes within the plain provisions of the statute. If this entry was valid, the plaintiff would take the legal title by his patent, and the contract would be mere waste paper. The title of the plaintiff therefore is clearly adverse to that of the defendant.

It must not be forgotten, however, that the defendant takes by *grant*, and not by purchase, and that when the quantity granted has been received it can take no more.

Sec. 19 of the act granting lands to the defendant, provides: "That for the purpose of aiding in the construction of said road, there be, and hereby is, granted to the said Burlington & Missouri River Railroad Company, every alternate section of public land (excepting mineral lands as provided in this act) designated by odd numbers, to the amount of ten alternate sections per mile on each side of said road, on the line thereof, and not sold, reserved, or otherwise disposed of by the United States, and to which a preemption or homestead claim may not have attached at the time the line of said road is definitely fixed; *Provided*, That said company shall accept this grant within one year from the passage of this act, by filing such acceptance with the secretary of the interior,

and shall also establish the line of said road, and file a
map thereof with the secretary of the interior within one
year of the date of said acceptance, when the said secre-
tary shall withdraw the lands embraced in this grant from
market."

The grant is of ten alternate sections per mile on each
side of said road, on the line thereof and not sold, re-
served, or otherwise disposed of  *  *  *  *  and to
which a preemption or homestead claim may not have at-
tached, etc.   The sections designated by odd numbers
for twenty miles on each side of the road, which were not
within the exceptions named, were set apart to the de-
fendant, and the deficiency to be supplied by lands to be
entered outside of this limit.   Now, suppose the proof
showed that the defendant, from a desire to favor parties,
who, like the plaintiff, had settled upon lands taken under
the homestead act, prior to February 20th, 1866, when the
lands in dispute were withdrawn from market, had selected
a sufficient quantity of lands on the same side of the
defendant's road, as the land in dispute is situated, equal
to ten sections per mile, and thus satisfy the grant on that
side, the plaintiffs patent would prevail over that of the
defendant; because, being a grant by quantity, and the
designation of the odd numbered sections merely a mode
of selecting the land, the defendant could not, after receiv-
ing the quantity of land granted to it, claim lands within
the twenty mile limit for which other tracts have been
selected in lieu thereof.   And the fact that lieu lands had
been selected would *prima facie* at least be an abandon-
ment of all lands for which such selections had been
made.   The defendant has constructed its railroad in
good faith, and has fully complied with the act of con-
gress making the grant, and is entitled to receive all the
benefits to be derived therefrom, and is entitled to receive
in the aggregate ten sections of land per mile, on each
side of the line of the road, and as the proof fails to show

that it possesses that quantity on the side of the road on which the land in dispute is situated, I concur in the affirmance of the judgment in ejectment, but think the plaintiff is entitled to payment for his improvements.